## Coker vs. The State.

On the trial of an indictment for murder, no threats made by the deceased against the prisoner are admissible in evidence, unless they were communicated to him before the killing. (*Atkins vs. The State*, 16 *Ark*. 584.]

The voluntary statements of the accused, made in an affidavit for continuance, and tending to contradict the testimony of his own witness, may be introduced against him by the State in a criminal case.

An instruction that if the deceased was unarmed, and the defendant killed him with a deadly weapon, no threats made by the deceased before the homicide will excuse the offence, or reduce it to manslaughter, if the combat was sought, or willingly entered into by the defendant; in connection with the further instruction, that if the threats were communicated to the defendant before the killing, and the deceased made such a demonstration as to furnish the belief that he designed to take the defendant's life, and that the danger was imminent, the killing was justifiable homicide; *Held*, unobjectionable.

The rule established in *Cornelius vs. The State*, (7 *Eng*. 810), and recognized in *Stanton vs. The State*, (13 *Ark*. 320), as to the separation of the jury in criminal cases, regarded as the settled practice in this State—where it is clearly shown that the jury were not subjected to improper influences, the verdict will not be set aside on account of their separation.

Motions for new trial on the ground of surprise, are addressed to the sound discretion of the Court, and the judgment of the Court upon them is not to be overruled here, unless it is clearly wrong. (*Nelson vs. White*, 18 *Ark*. 574.)

*Appeal from the Circuit Court of White County.*

Hon. William C. Bevens, Circuit Judge.

McConauhey and Hempstead, for the appellant.

The showing made on the ground of surprise was sufficient, and a new trial should have been granted. 1 *Clarke's R*. 162; 3 *Marsh. R*. 109; 2 *Bibb* 33; 8 *B. Mon*. 39; 16 *Wend*. 62; 9 *Humph*. 654; 4 *Blackf*. 307; 6 *Eng*. 16; 18 *Ark*. 57.

It was illegal to permit the State to read the affidavit of

Coker to the jury to *impeach* witness Nolen. 1 *Hawk.* 6; 2 *Hall* 40; 17 *John. R.* 89; 3 *Cowen R.* 612; 4 *M. & S.* 532.

Defendant had a right to show previous threats of deceased, therefore the testimony of D. C. Williams was improperly excluded. *Gould's Dig.*, p. 325, *sec.* 11; and to show a want of malice. *Ib.* 328, *sec.* 4.

The separation of the jury was irregular, and, the verdict being against the prisoner, the law presumes that the irregularity was prejudicial to him, and the verdict should be set aside. 1 *Ch. Cr. L.*, *Marg.* p. 128,–9, *note;* and the burden of proof is upon the State to show that the prisoner has suffered no injury from the separation, *Ib.;* and if the State fail to do so, the verdict will be set aside. 7 *New Hamp.* 287.

HOLLOWELL, Attorney General, for the State.

It is submitted that the prisoner has not shown that character of surprise contemplated by law, entitling him to a new trial. *Whart. Cr. Law*, p. 921,–2; *Guthrie vs. Bogart*, 1 *A. K. Marsh.* 334; *Young vs. Com.*, 4 *Grat.* 550; *Wolford vs. Com.*, *Ib.* 553; *Com. vs. Benesh, Tatcher's C. C. R.* 684; *McLane vs. Com.*, 2 *Bibb* 17.

That there was no error in the Court below in permitting the affidavit of prisoner to be read as evidence of what it contained to the jury, it is submitted, is a question fully settled by the elementary writers on the subject of evidence. 1 *Phil. Ev.*, 404. 405, 406, *and notes.*

The separation of the jury, after the case had been submitted to them under the charge of the Court, and before they returned their verdict, under the state of case presented by the record, is no ground of error in the ruling of the Court below for refusing to grant the prisoner a new trial. The presumption of the law is, the jury, though in two parcels, were under the eye of their officer. There is no evidence that either parcel of the jury were tampered with. The mere act of separation will not entitle the prisoner to a new trial. *McCoster vs. Com.*, 11 *Leigh.* 633; *Martin vs. Com.*, *Ib.* 745; *Kennelly vs. Com.*, 2

*Vir. Cas.* 510; *People vs. Douglass,* 4 *Cow.* 26; *Oliver vs. Trustees,* 5 *Cow.* 286; *People vs. Ransom,* 17 *Wend.* 423; *People vs. Bebee,* 5 *Hill* 32; *State vs. Prescott,* 7 *N. Hamp.* 290.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

*Calvin Coker* was indicted in the Marion Circuit Court for the murder of *Matthew Owens;* upon his application, the venue was changed to White county, where he was tried, on the plea of not guilty, convicted of murder in the second degree, and sentenced to the penitentiary for seven years. He moved for a new trial, which was refused, and he excepted and appealed to this Court.

The grounds of the motion for a new trial, will be considered in the order in which they appear upon the record:

1. The Court excluded from the jury part of the testimony of *Dixon C. Williams.*

*Williams* testified, among other things, that he had a conversation with Owens, on the way to his house, some months before he was killed, in which Owens told him that he believed that Bill Coker, old Jo. Coker, and *Calvin Coker* had conspired against him, because he would not succumb to them; but if they ever came in collision with him, he would get one or two of them while they were getting him, etc. That after witness and Owens got to the house, " *Owens showed him a pistol, and asked him if he did not think that would do to take them. He said it was sure fire: a dead shot.*"

It seems that Williams communicated to Calvin Coker, before the killing, what Owens said to him on their way to the house, and the Court permitted that to go to the jury, but excluded so much of Williams' testimony as related to what Owens said to him about the pistol, etc., after they got to the house; because it was not communicated to Coker, by the witness, before the killing.

The ruling of the Court on this point was in accordance with the decision of this Court in *Atkins vs. The State,* 16 *Ark.* 584.

2. The Court permitted an affidavit for continuance, made

by the prisoner, to be read in evidence to the jury, on the part of the State, against the objection of the prisoner, etc.

It is supposed that the affidavit was introduced for the purpose of contradicting the testimony of *Nolen,* a witness for the prisoner.

It appears that, at the term of the Circuit Court of Marion county, at which the indictment was preferred against Coker, (April, 1857), he filed an affidavit for continuance, on the grounds, among others, that *Nolen,* a material witness for him, was absent. That he expected to prove by him that the deceased made threats against affiant (Coker), a short time before the killing, etc., and that he was not informed and did not know that he could prove such threats by *Nolen* until after the indictment was preferred, etc.

It also appears that, upon the trial, Coker introduced *Nolen* as a witness in his behalf, and that he testified that some time before the killing he heard the deceased make threats against Coker, which he communicated to him before the killing, etc.

The voluntary statements of the accused, in a criminal case, in relation to any matter connected with the crime, whether made verbally or in writing, may be introduced against him by the State. We know of no good reason why the statements, made by him in an affidavit for continuance, should be excepted from this general rule, and excluded. The witness *Nolen* testified that he communicated the threats to Coker before the killing. The sworn statement of Coker tended to contradict the witness on this point, and it seems to us that it was competent for the State to introduce it for what it might be worth in the estimation of the jury.

3. That the Court erred in the instructions given to the jury of its own motion.

These instructions cover nearly nine pages of fools-cap paper, and are principally made up of extracts from our statute, and from the standard text writers, on the several grades of homicide. No specific objection to any particular feature of them is made in the bill of exceptions, or in the

argument for the appellant. They are as favorable to the prisoner as the facts of the case warranted; and manifest a disposition, on the part of the Court, to furnish the jury with such plain and simple rules of evidence, familiar illustrations, etc.. as would assist them in making up a just and impartial verdict between the State and the prisoner, etc.

4. On motion of the attorney for the State, the Court instructed the jury as follows, against the objection of the prisoner:

1. " If the jury find from the evidence that the defendant armed himself with a deadly weapon, or being armed with a deadly weapon, provoked the deceased, by insulting words, to resentment, without the use of a deadly weapon, intending to slay him, and did slay him under the pretence of acting in self-defence, the killing is regarded, by law, as murder in the first degree.

2. " If they believe from the evidence that the deceased was unarmed, and that the defendant used a knife, which was a deadly weapon, no threats made by the deceased before the homicide will excuse the offence, or reduce it to manslaughter, if the combat was sought, or willingly entered into by the defendant."

In connection with these instructions, the Court also gave, at the request of the prisoner, the following:

1. " If the jury find from the evidence, that the defendant was attacked in such manner and under such circumstances as to furnish reasonable ground for apprehending a design to take his life, or to do him some great bodily harm, and that there was reasonable ground for apprehending a design to take away his life, or do him some great hodily harm, and there was reasonable ground for believing the danger imminent, that such design would be accomplished, they should find for the defendant.

2. " If the jury find from the evidence, the deceased had made threats against the life of the defendant, and that these threats had been communicated to the defendant before the

4

killing, and that the deceased made a demonstration in such manner, or under such circumstances, as to furnish the belief that there was a design to take away his life, or do him great bodily harm, and that there was reasonable ground to believe the danger imminent that such design would be accomplished, and that the defendant killed Owens, it, in law, would be justifiable homicide, and they should find for the defendant."

Perhaps a killing under the circumstances supposed in the first special instruction given for the State, might be murder in the first degree, and perhaps there were some features of the testimony that warranted the giving of the instruction; but neither of these points need be positively decided, as the appellant was acquitted of murder in the first degree, and was, therefore, not prejudiced by the instruction.

The second special instruction, given at the instance of the State, is unobjectionable, especially when considered in connection with the second instruction given on behalf of the appellant.

5, 6 & 7. The *fifth*, *sixth* and *seventh* grounds of the motion for a new trial are substantially the same—that the verdict was contrary to law and evidence.

Upon this point, the argument of the counsel for the appellant is silent.

The testimony conduces to show that Coker and Owens differed about some change. Owens insisting that he had given Coker $2 50, by mistake, in making change, which Coker denied. Owens sued Coker for the amount in controversy before a justice of the peace. The parties met at De Buque, on the 7th of February, 1857, for trial. After one witness had given his testimony, it was mutually agreed that the case should be submitted to the justice upon the statements of the parties. Whilst Owens was making his statement, Coker intimated that he was swearing falsely. The parties differing in their versions of the matter, the magistrate stated that he would take the case under advisement. Coker then went out of the justice's office, and returned with some liquor in a tin dipper, and passed it round to the company, offering it to Owens, perhaps,

who declined to drink. Coker then sat down at the fire, by the side of Owens, and said to him that he had sworn what he would not swear for Marion county. Owens replied, that he had sworn it, and would swear it again. To which Coker responded that if he did, he would swear a d—d lie; whereupon, Owens arose, saying he could stand it no longer. Coker arose at the same time, and they caught each other by the hands. A brother of Owens took hold of him, and pushed him back into one corner of the room; the magistrate, at the same time, taking hold of Coker, and shoving him back to the door, some 8 or 10 feet from Owens. Coker then drew a Bowie-knife, broke loose from the magistrate, rushed on Owens, and thrust his knife into his bosom, giving him a mortal wound, of which he very soon died. Some of the witnesses say that whilst the magistrate held Coker back at the door, Owens pulled off his blanket overcoat, and dropped it down by him. None of the witnesses testify that he made any attempt to use a weapon, if he had any about him. They found none upon his person when he was stripped after he was killed.

One witness swore that he gave him a pistol before the trial, and slipped in and took it out of his overcoat pocket immediately after he was stabbed.

The above is the substance of the facts connected with the killing, as stated by most of the witnesses. One or two witnesses make a more favorable version of the facts for the prisoner.

Upon all the facts of the case, the conclusion is inevitable that there was no want of testimony to sustain the verdict.

8. The eighth ground of the motion for a new trial is, that the jury separated, after the cause was submitted to them, without leave of the Court, or consent of the counsel, and may have been subjected to improper influences, etc.

In support of this ground, the following affidavits were filed:

" We, Samuel Pilkington and Dan. Pilkington, do solemnly swear, that after the jury in the case of the State vs. Coker were charged by the Court, and said case was submitted to

them, and before the opening of the Court on the next morning, and before said jury had rendered their verdict in said cause, *to-wit:* on Saturday morning, the 9th inst., we saw Wm. Hendrix, David G. Lowell, and three others of said jury, separated from the balance of said jury, at so great a distance that they were entirely out of sight of the other seven of said jury. That the five seen by us were on the commons, east of the office of G. W. McCauley, esq., and that we looked to see where the others were, but could not see them. January 11th, 1858."

" I, W. E. Clayton, do solemnly swear that, after the case of the State vs. Coker was submitted to the jury, and before said jury had rendered their verdict in said case, *to-wit:* on Saturday morning, the 9th inst., I saw about half of said jury in the woods adjoining the north-east portion of the town of Searcy, and so far separated from the other half as to be entirely out of sight of them. That I looked about to see where the others of said jury were, but could not see them. January 11th, 1858."

For the general rule as to misconduct of jurors, and its effect upon the verdict, see opinion of this Court in *Collier vs. State, present term.*

In relation to the separation of the jury in criminal cases, the rule established in *Cornelius vs. The State, 7 Eng.* 810, recognized in *Stanton vs. The State,* 13 *Ark.* 320, and which may be regarded as the settled practice in this State, is, that where it is shown by the accused that one or more of the jurors separated from the panel, without leave of the Court, or consent of parties, and were thereby exposed, under the surrounding circumstances, to improper influences, the presumption is against the purity of the verdict, unless it be affirmatively shown, on the part of the State, that they were not, in point of fact, subjected to such improper influences.

The affidavits in this case fall short of showing a separation of jurors within the meaning of this rule.

All three of the affiants, doubtless, refer to the same separation. It was in the morning of the 9th of January, before the

Court met.  They saw about half of the jurors on the commons, or in the woods, adjacent to the town of Searcy., and
could not see the others—the others were not in view.  Where
the affiants took their position, how far from the place where
the jurors were, or what intervening objects there may have
been, the affiants do not state.  Nor do they state that the
officer who had charge of the jury was not with or near the
jurors seen by them upon the common; nor that other persons
were about the jurors, who might have approached them, or
spoken in their hearing, in reference to the trial.

The record shows that the jury were empanneled on the 4th
of January, and the trial progressed from day to day until the
8th, when the cause was finally submitted to them, and they
retired, in charge of an officer, and returned into Court with
their verdict on the 9th.  It has not been the practice in this
State to lock up juries in rooms, and keep them in close confinement from the time the cause is submitted to them, until
they render their verdict.  Suitable rooms for such continuous
and exclusive confinement could rarely be furnished in the
places where our Courts are holden.  It is a very common
practice for juries, during the day time, to retire to the woods
which are adjacent to most of our court-houses, for the purpose
of making up their verdicts, whilst the officer in charge stations
himself at a respectful distance from them, so as not to intrude
upon their deliberations himself, but to guard them from the
approach of others.  And where the jury are confined to a
room during the night, which is usually the case, they are not
unfrequently permitted, by the officer, to retire to the woods in
the morning.  It ʳis more than probable that the jury, in this
case, after having been left in a room during the night, were
allowed, by the officer, to retire to the woods on the morning
of the 9th of January for a sufficient reason; and, perhaps, if
the affiants had ascertained and stated all the facts, in their
affidavits, the cause of some of the jurors being out of sight
would have been accounted for.

If verdicts were set aside upon such affidavits of separation

as the one now before us, a verdict would rarely be permitted to stand where the accused is found guilty of a grave offence.

9. The ninth ground of the motion for a new trial is, that appellant was surprised by the testimony of *Noah Stoops*, etc.

*Stoops* testified, on the part of the State, that he saw Coker, when he came out of the justice's office, immediately after he stabbed Owens: that he had a knife in his hand, which had blood on it: that he appeared to be in a passion, and said " there was a damned rascal in there who had sworn a lie against him, but he would not do it again."

In support of this ground for a new trial, Coker filed his own affidavit, stating that he made no such declaration as that attributed to him by Stoops, at the time referred to by the witness, or at any other time. That he was surprised by his testimony as to such declaration: that he believed he could prove by several persons, and especially by Isham Stinnett, that Stoops was so much intoxicated at the time of the killing that he was unable to comprehend or recollect such declaration, if it had been made. That affiant did not know what Stoops would swear until he was put upon the stand, etc. That he told affiant and others that he did not know what he was summoned for, etc. That the witnesses, by whom affiant expected to prove that Stoops was intoxicated on the day of the killing, resided in Marion county, and it was out of the power of affiant to produce their affidavits, etc. That affiant had been informed by one or more of the jury that it was the testimony of Stoops that induced his conviction, etc.

The affidavit of Benj. Hudson was also filed in support of this ground, who stated that *Stoops* told him during the progress of the trial that he did not know what they wanted him as a witness for; that he knew nothing about the case.

Motions for new trials on the grounds of surprise, are addressed to the sound discretion of the Court, and the judgment of the Court upon them is not to be overruled here, unless it is clearly wrong. *Nelson vs. White*, 18 *Ark*. 574.

*Stoops* was the second witness examined for the State, on the

trial.   It does not appear that he was cross-examined by the appellant, or asked if he was intoxicated on the day of the killing.   A number of witnesses, on both sides, was examined after he was, who professed to have been present when Owens was killed, and it does not appear that appellant attempted to prove by any of them that Stoops was intoxicated on that day. His testimony in relation to the conflict between the parties, and the incidents immediately preceding, is corroborated by most of the other witnesses.   Several of the witnesses testified that when Coker went out of the justice's office, immediately after he stabbed Owens, he had the Bowie-knife in his hand, and was in a rage; though none of them professed to have heard him make the particular declaration testified to by *Stoops.*

Upon the whole, we think there was no abuse of the sound legal discretion of the Court below in overruling the motion for a new trial on the grounds of surprise.

10.  The tenth and last ground of the motion for a new trial is, that there was no valid indictment against appellant, etc.

This, if true, would be ground for arresting the judgment, rather than granting a new trial; but the objection is unfounded. The indictment appears to be in good form, and was regularly preferred.

The judgment of the Court below is affirmed.