The State v. Bailey.

THE STATE OF KANSAS V. JULIUS I. BAILEY.

| | |
|---|---|
| 32 | 83 |
| 44 | 192 |
| 44 | 664 |
| 32 | 83 |
| 46 | 756 |
| 32 | 88 |
| 48 | 754 |
| 32 | 83 |
| 49 | 243 |
| 50 | 74 |
| 50 | 669 |
| 32 | 83 |
| 51 | 213 |
| 32 | 83 |
| 57 | 675 |
| 32 | 83 |
| †60 | 786 |
| 60 | 787 |
| 32 | 83 |
| 62 | 224 |
| 32 | 83 |
| 70 | 395 |
| e70 | 868 |
| 32 | 83 |
| 71 | 350 |
| 32 | 83 |
| 79 | 529 |
| 80 | 486 |

1. PRELIMINARY EXAMINATION; *What is not Necessary—What is.* In a criminal prosecution for a felony, where the defendant interposes a plea in abatement, upon the ground that he has not had any proper preliminary examination, *held,* that the only questions presented to the court for consideration are, whether an attempt has been made to give the defendant a preliminary examination; and whether, by such attempt, reasonable notice has been given to him with regard to the nature and character of the offense charged against him. And it is not necessary, in such a case, that the papers and proceedings on the preliminary examination should be technically regular and exact, like the papers and proceedings required on the final trial. It is not necessary that the papers and proceedings on the preliminary examination should set forth the offense in all its details, and with perfect and exhaustive accuracy. For the purpose of authorizing a final trial, and requiring that the defendant should plead to the merits of the action, all that is necessary is that the defendant should be given a fair opportunity to know, by a proffered preliminary examination, the general character and outlines of the offense charged against him; and it is not necessary that all the details and technical averments, required in an information, should be set forth in the papers used on the preliminary examination; and the defendant should take notice, from the evidence introduced by the state on the preliminary examination, as well as from the papers in the case, of the nature and character of the offense charged against him.

2. MURDER; *Peremptory Challenges; Rule, Not Erroneous.* The trial court in a criminal prosecution for murder in the first degree established a rule for the impaneling of the jury, that the state should exercise one of its peremptory challenges, and then the defendant should exercise two of his peremptory challenges, and then the state should exercise one and the defendant two, and so on, alternately, until all the peremptory challenges, given by law to the parties, should be exhausted, the state having six peremptory challenges, and the defendant twelve. *Held,* That the court did not err in establishing such rule; and *further held,* that as the defendant waived the eighth, ninth, tenth, eleventh and twelfth of his peremptory challenges, and voluntarily refrained from exercising the same, the error would be immaterial even if such ruling had been erroneous.

3. INCOMPETENT EVIDENCE—*No Error in Introduction.* And in such criminal prosecution, where incompetent evidence, injurious to the defendant, is drawn out by the defendant on the cross-examination of one of the witnesses for the state, and is not otherwise introduced on the trial, *held,* that the trial court did not err as against the defendant in permitting such incompetent evidence to be introduced.

4. INSTRUCTIONS—*No Error.* It is not necessary for a trial court to repeat

its instructions to the jury, or to give the substance of the same more than once; and it is not error to refuse to give an instruction which, if given, would be misleading.

5. MISCONDUCT OF JURY AND BAILIFF; *New Trial Denied.* In a criminal case, after the jury have retired to consider of their verdict, it is misconduct for a bailiff to enter.the jury room while the jury are in session; and it would be gross misconduct for the bailiff, or anyone else, to enter the jury room while the jury were in actual consultation or deliberation with regard to their verdict; but such was not done in the present case. It is also misconduct for the jury to separate after retiring to consider of their verdict and before rendering their verdict. It is also misconduct for them to eat anything during such time, except with the express permission of the court; and where such misconduct is shown on the part of the bailiff or jury, it then devolves upon the prosecution to show that nothing transpired which could in the least have influenced any member of the jury adversely to the interests of the defendant. Such was done in the present case, by the oral testimony of every member of the jury, and of the bailiff and others; therefore, *held,* that although there was misconduct on the part of the jury and bailiff in the present case, still that the defendant is not entitled to a new trial on the ground of such misconduct.

6. ———— The evidence discussed, and held to be sufficient to sustain the verdict of the jury.

### Appeal from Reno District Court.

PROSECUTION for murder in the first degree. The defendant, *Julius I. Bailey,* was charged with feloniously killing and murdering his father, John P. Bailey, on May 21, 1883, in Reno county. Trial at the special term of the district court, begun July 24, 1883. Conviction and sentence for murder in the first degree. Defendant appeals. The opinion contains a sufficient statement of the case.

*James McKinstry,* for appellant; *Scheble & Vandeveer,* of counsel.

*W. A. Johnston,* attorney general, and *R. A. Campbell,* county attorney, for The State; *Edwin A. Austin,* of counsel.

The opinion of the court was delivered by

VALENTINE, J.: This was a criminal prosecution for murder in the first degree. The defendant, Julius I. Bailey, was

charged with feloniously killing and murdering his father, John P. Bailey, on May 21, 1883, in Reno county, Kansas. He was tried, convicted and sentenced for that offense, and he now appeals to this court. The principal grounds upon which he relies for a reversal of the judgment of the court below may be stated under the following general heads: (1) error of the court below in finding against the defendant's plea in abatement; (2) error of the court below in the rule it established for the exercise by the parties of their peremptory challenges; (3) error of the court below in the admission of evidence; (4) error of the court below in refusing to give certain special instructions, numbered 2, 4, and 7, asked for by the defendant; (5) error of the court below in refusing to grant a new trial for misconduct of the jury; (6) error of the court below in refusing to grant a new trial because of insufficiency of the evidence to sustain the verdict.

These grounds for reversal we shall consider in their order.

I. The defendant claims that the court below erred in finding against him upon his plea in abatement, for the following reasons: He claims that no preliminary examination was ever had with respect to the offense charged against him; that he had never waived any such preliminary examination; that he had never been a fugitive from justice; and he makes this claim that no preliminary examination was ever had, for the sole reason that the warrant upon which he was arrested and the other papers upon which the supposed preliminary examination was had, did not state or show any offense, nor charge any offense against him. Upon the hearing of the defendant's plea in abatement, the following facts, among others, were shown: The defendant was arrested on May 21, 1883, by the sheriff of Reno county, on the warrant of the coroner of such county, which warrant reads as follows:

"STATE OF KANSAS, RENO COUNTY.— *The State of Kansas to J. M. Hedrick, Sheriff of Reno County:* Whereas, on the 21st day of May, 1883, notice was given me, the undersigned, A. W. McKinney, a coroner in and for said county, that the dead body of a man had been found at the N. W. ¼, sec. 9, town 24 S., range 5 west, in said county, supposed to have

died by unlawful means; thereupon I issued a summons for six citizens of said county, and directed the same to J. M. Hedrick, sheriff of said county, returnable forthwith. Summons returned at 10 o'clock.

"The following jurors appeared: A. M. Switzer, J. Q. Robertson, J. C. Moore, J. Peter Klein, George I. Wainner, Edward Dennis, who were duly sworn. The jurors having inspected the body, heard the testimony, and made all needful inquiries, returned to me their inquisition in writing under their hands, as follows:

'STATE OF KANSAS, RENO COUNTY.—An inquisition, holden at the residence of J P. Bailey, on section 9, town. 24, range 5, in said county, on the 21st day of May, 1883, before me, A. W. McKinney, coroner of said county, on the body of J. P. Bailey, there lying dead, by the jurors whose names are hereunto subscribed. The said jurors, upon their oaths, do say he came to his death by being hit upon the head with a piece of iron water-pipe in the hands of J. I. Bailey.

Given under our hands, this day of inquisition.

A. M. SWITZER.    J. C. MOORE.
J. Q. ROBERTSON.    GEO. I. WAINNER.
J. PETER KLEIN.    EDWARD DENNIS.'

"You are therefore required to arrest the said J. I. Bailey, and bring him forthwith before George D. Barclay, at his office in Hutchinson, in said county, to answer said charge, and then and there return this writ.

"Witness my hand, in Reno county, this 21st day of May, 1883.    A. W. McKINNEY,
Coroner Reno County.

Upon this warrant a preliminary examination was had before a justice of the peace, commencing on May 22, 1883. Prior to the preliminary examination, however, the defendant moved the justice of the peace to quash the warrant, and dismiss him from custody, for the reason that said warrant did not charge any offense. The justice overruled the motion, and then proceeded with the preliminary examination, and upon such preliminary examination found and ordered as follows:

"The court finds that there are reasonable grounds for believing that the defendant, J. I. Bailey, committed the offense charged; it is therefore ordered by the court that the said defendant, J. I. Bailey, be committed to the jail of Reno county until the next regular term of the district court, to answer said charge."

Afterward the justice issued the following warrant of commitment, to wit:

"STATE OF KANSAS, RENO COUNTY.—*Before Geo. D. Barclay, J. P. of Reno Township.*—To the sheriff or any constable of Reno county: Whereas, one J. I. Bailey was, on the twenty-first day of May, 1883, arrested on a warrant issued by A. W. McKinney, coroner of Reno county, charging the said J. I. Bailey with the killing, feloniously, of one J. P. Bailey, in said Reno county, state of Kansas; and whereas, said J. I. Bailey, after a preliminary examination, held before the undersigned justice of the peace, it is found that said J. P. Bailey has been feloniously killed, and that said J. I. Bailey is probably the guilty party, you are therefore commanded forthwith to take the said J. I. Bailey, and commit him to the jail of Reno county, there to remain until the next term of district court, to be dealt with according to law.

"Witness my hand, at my office in said township, this 24th day of May, 1883.     GEO. D. BARCLAY, J. P."

The evidence introduced on the preliminary examination was preserved, and is contained in the record of this case; and we think it is amply sufficient to authorize the justice of the peace to find that the offense of murder in the first degree had been committed by some person, by the killing of said J. P. Bailey by means of an iron water-pipe, as charged in the information, and that there was probable cause to believe that the defendant was guilty of such offense; and therefore we think there was sufficient evidence introduced to authorize the justice of the peace to commit the defendant, as he did, to the county jail of Reno county, to abide the event of a final trial in the district court. Undoubtedly the foregoing proceedings were irregular. The facts were not set forth in exhaustive detail, nor as fully as they should have been, nor with perfect accuracy; and yet we do not think that the proceedings were so irregular for these reasons as to be utterly void. We do not think that they were so irregular that the defendant can say that he never had any preliminary examination with regard to the offense for which he was finally prosecuted. He did in fact have a preliminary examination, and therefore the claim that he did not have any preliminary examination is not true. The

proceedings were simply irregular, and not void. The coroner's warrant, however, states, and the coroner's jury find, that the deceased, J. P. Bailey, "came to his death by being hit upon the head with a piece of iron water-pipe in the hands of J. I. Bailey;" and the warrant also states that the deceased was "supposed to have died by unlawful means," and orders the arrest of said J. I. Bailey. This clearly charges J. I. Bailey, the defendant, with the commission of the homicide, and also states, inferentially, that the killing was done feloniously. The justice of the peace found that the defendant committed the offense charged, and found, as his warrant shows, "that said J. P. Bailey has been feloniously killed, and that said J. I. Bailey is probably the guilty party;" and the justice of the peace also committed the defendant to the jail of Reno county for such offense.

Now the main object of a preliminary examination is, in all probability, for the purpose of having the question determined judicially whether a person who is suspected of being guilty of the commission of a criminal offense shall be held for his appearance and trial in the district court. It is to prevent the escape of guilty persons, on the one hand, and to avoid the detention and imprisonment of innocent persons, on the other; and this main object of a preliminary examination is satisfied whenever a party appears before the district court for trial and subjects himself to the orders and judgment of the district court. But a preliminary examination is probably also for the purpose of giving to the defendant a reasonable notice of the nature and character of the offense charged against him; and the state should in all cases give the defendant such notice by a proffered preliminary examination, unless the defendant waives the same or is a fugitive from justice. (Crim. Code, § 69.) The question as to whether a preliminary examination has ever been had in any particular case, may be raised in various ways: (1) By a writ of *habeas corpus*, if the defendant has been imprisoned; (2) by an action for false imprisonment, if the defendant has been imprisoned; (3) by a defense to the bond, if the defendant has given a

bond, and an action thereon has afterward been commenced for an alleged breach thereof; (*Redmond v. The State,* 12 Kas. 172); (4) by a plea in abatement, as in the present case; (*The State v. Smith,* 13 Kas. 274, 296); (5) by objecting to the taxation of any costs against him for the supposed preliminary examination.

When the question is raised by a plea in abatement, as in the present case, we think the only questions presented for consideration are, whether an attempt has been made to give the defendant a preliminary examination, and whether by such attempt reasonable notice has been given to him with regard to the nature and character of the offense charged against him. If no attempt has been made to give the defendant a preliminary examination, and if he has not waived the same, and was not at the time of the filing of the information a fugitive from justice, we think the plea in abatement should be sustained; and also where the preliminary examination has not been waived and the defendant has not been a fugitive from justice, and has not had, through the instrumentality of a preliminary examination, any reasonable notice of the nature and character of the offense charged against him, we think the plea in abatement should also be sustained. But it is not necessary that the papers and proceedings on a preliminary examination should be technically regular and exact, like the papers and proceedings on the final trial. It is not necessary that the papers and proceedings on a preliminary examination should set forth the offense in all its details and with perfect and exhaustive accuracy. For the purpose of authorizing a final trial and of requiring that the defendant should plead to the merits of the action, all that is necessary is that the defendant should be given a fair opportunity to know by a proffered preliminary examination the general character and outlines of the offense charged against him; and it is not necessary that all the details and technical averments required in an information should be set forth in the papers used on the preliminary examination. And the defendant should take notice from the evidence introduced by the state on the pre-

liminary examination, as well as from the papers in the case, of the nature and character of the offense charged against him. In the present case, the defendant had an opportunity to know, and did know, from the preliminary examination, all that was necessary for him to know. As giving some support to the foregoing views, we would cite the following cases: *Redmond v. The State*, 12 Kas. 172, 176; *The State v. Smith*, 13 id. 274, 296; *The State v. Pritchard*, 35 Conn. 319.

We think the defendant's plea in abatement was rightfully overruled; but it must also be remembered that § 293 of the criminal code provides that—

"On an appeal, the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties."

II. The defendant claims that the court below erred in establishing a rule for the impaneling of the jury in this case that the state should exercise one of its peremptory challenges, and then the defendant should exercise two of his peremptory challenges, and then that the state should exercise one and the defendant two, and so on alternately, until all the peremptory challenges given by law to the parties should be exhausted. We think there was no error committed by the court in establishing this rule. But even if there was, the error was not material, nor could it have affected prejudicially the substantial rights of the defendant, for the defendant waived the 8th, 9th, 10th, 11th and 12th of his peremptory challenges, and voluntarily refrained from exercising the same. Under the statutes, in a case of murder, like the present, the defendant is entitled to twelve peremptory challenges, and the state is entitled to just half that number. (Crim. Code, §§ 198, 199.)

III. One of the counsel for the defendant, Mr. McKinstrey, claims that the court below erred in admitting the testimony of William E. Chambers relating to conversations had by him with the deceased in the absence of the defendant. This point does not seem to be relied upon by the other counsel for the defendant, Messrs. Scheble & Vandeveer. Now, portions of these conversations could not possibly have been prejudicial

to the defendant; portions were withdrawn by the court from the jury, and the jury not permitted to consider the same; other portions were drawn out by the defendant on cross-examination, and were not introduced by the state on the examination-in-chief; and, indeed, nearly all of them were permitted to go to the jury without objection. We do not think that it is necessary to mention any portion of them except those whereby Chambers claimed that the deceased had agreed to lease to him the farm upon which the defendant and Chambers then resided, and which belonged to the deceased, and to put nearly all the personal property situated on said farm into the hands of Chambers. This evidence was undoubtedly damaging to the case of the defendant; for on the death of the deceased, the defendant immediately, under the statutes, obtained a one-fourth interest in all such property, and was likely to retain the possession thereof; for his mother and sister, to whom the other three-fourths interest descended, did not reside in the state of Kansas. But if the deceased had continued to live, the defendant, in consequence of the supposed agreement between the deceased and Chambers, would have been deprived of the use and benefit of all such property; and without this property, he was almost helpless, with a wife and two children to support. It is certainly doubtful whether this evidence was competent. It would have been competent by showing that the defendant had knowledge of the supposed intended lease; or it would have been competent if the defendant had claimed on the trial, and made his defense upon the theory that it was Chambers who killed the deceased; but it scarcely appears that the defendant had any knowledge of said supposed lease, or that he even intimated on the trial that Chambers had any guilty connection with the death of the deceased. But even if the evidence was incompetent, we hardly think that the defendant can say that the court below erred in admitting it. Whenever the state attempted to introduce any such evidence, and the defendant objected thereto, the court promptly sustained the objection; and none of it was introduced over the objection of

the defendant, but all, or nearly all, was given to the jury on the defendant's cross-examination of Chambers.

IV. The defendant claims that the court below erred in refusing to give certain special instructions, numbered 2, 4, and 7, asked for by the defendant. Now all that was proper in these instructions was given by the court to the jury in its general charge, and it was not necessary for the court to repeat its instructions or to give the substance of the same more than once. We think, however, that the court might properly have refused to give No. 7 of said instructions without incorporating the same in its general charge, or in any of its other instructions; for, if given, it would have been misleading, and therefore erroneous.

V. We think there was misconduct on the part of the jury, and also on the part of the bailiff attending the jury. R. B. Shadduck was the bailiff who was sworn to take charge of the jury when they retired for deliberation at the close of the trial. L. W. Mills was another bailiff of the court; but he was not sworn to take charge of the jury, nor was it his duty to do so. Indeed, he could not rightfully take charge of the jury. The trial closed at the close of the day of September 10, 1883, and the jury immediately retired for deliberation, and remained in session during the entire night; and while they agreed upon their verdict at some time during the night, yet they did not render their verdict until the next morning when the court convened. At the close of the trial, Shadduck took charge of the jury and conducted them to a room in the court house, adjoining the court room, which was assigned to the jury for consultation and deliberation. Shadduck at several times during the night entered the jury room, while the jury were in session. He also at one time left the jury for nearly half an hour in the charge of Mills; and Mills, while Shadduck was absent, also entered the jury room at one or more times. Mills also entered the jury room while Shadduck was present. At one time during the night three of the jurors were allowed to enter the court room to get a drink; and at another time during the night Mills conducted one or two of the jurors to the water

closet in the rear of the court house, about 75 feet distant. Also, during the night one or more of the jurors told stories. In the morning, after the jury had agreed upon their verdict, but before the verdict was signed or returned to the court, the jury were conducted by Shadduck to a restaurant or boarding-house, where they ate breakfast.   According to the oral testimony, however, of Shadduck and Mills and every one of the jurors, given in open court, on the hearing of the defendant's motion for a new trial, neither Shadduck nor Mills was in the jury room while the jury were actually deliberating upon their verdict; and nothing was said by Shadduck or Mills to the jury, or to any member thereof, or by any member of the jury to Shadduck or Mills, or in their presence or hearing, about the case, except that after the jury had agreed upon their verdict, Shadduck asked one of the jurors to tell him what the verdict was; but it does not appear that the juror told him. And such evidence with other evidence also shows that no person had any conversation with any member of the jury with reference to the case from the time when the case was first submitted to the jury at the close of the trial until the jury finally rendered their verdict in open court, the next morning.

We would therefore think from the evidence that the jury must have been absolutely free from all outside influences which might have affected their verdict in the least. As before stated, the oral testimony of every juror and of Shadduck and Mills and of others, was heard by the court below, and this testimony all tended to show that nothing could have occurred which might have prejudiced the rights of the defendant.   There is nothing even in the evidence of the defendant which tends to show that any wrong influence was brought to bear upon any member of the jury.   The defendant's evidence merely tends to show that there were opportunities open for the presentation of such wrongful influence, provided there were any evil-disposed person lurking around the jury room or near there desirous of doing so.   Besides, the defendant's principal evidence was merely in affidavits, and his principal evidence, whether embodied in affidavits or

not, was not given by disinterested persons. Of course it was misconduct for either Shadduck or Mills to enter the jury room while the jury were in session; and it would have been gross misconduct if either of them had entered the jury room while the jury were in actual consultation or deliberation with regard to their verdict; but this they did not do. And it was misconduct to allow the jury to separate, as they did, or to allow them to eat anything except with the express permission of the court. After the defendant showed the foregoing misconduct on the part of Shadduck and Mills and the jurors, we think it then devolved upon the prosecution to show that nothing happened which could in the least have influenced any member of the jury adversely to the interests of the defendant. But this, we think, the state did. Therefore we cannot say that the court below erred in holding that such misconduct was not sufficient to entitle the defendant to a new trial. (See authorities cited by counsel for the state, as follows: *Woodward v. Leavitt*, 107 Mass. 453; *Perry v. Bailey*, 12 Kas. 539; *The State v. Snyder*, 20 id. 306; *Martin v. The People*, 54 Ill. 225; *The State v. Stark*, 72 Mo. 40; *The State v. Wart*, 51 Iowa, 587; *Taylor v. Everett*, 2 How. Pr. 23; *People v. Kelley*, 46 Cal. 357; *Kee v. State*, 28 Ark. 155, 156; *Kennedy v. Com.*, 2 Va. Cases, 510; *State v. Cucuel*, 31 N. J. L. 249; *Coker v. State*, 20 Ark. 53–61; *Jenkins v. State*, 41 Tex. 128; *People v. Lee*, 17 Cal. 76.)

VI. The defendant claims that the verdict of the jury is not sustained by sufficient evidence. Now as the evidence is wholly circumstantial, the defendant is afforded an opportunity to claim that it does not prove his guilt. We think it does, however; but from its great length, we cannot give it in this opinion. Indeed, it is so very voluminous, and involves such a vast number of details, that we shall not attempt to give any more than a mere outline of some of the principal facts which it tends to prove. The deceased was a man of considerable means. He owned a section of land situated about six or seven miles southeast of Hutchinson, in Reno county, Kansas; and he also owned a large amount of personal property, con-

sisting of horses, mules, cattle, sheep, hogs, crops, farming implements, etc., situated on said land, and worth in the aggregate, several thousands of dollars. He was 57 years of age, and had a wife and two children, the defendant and one daughter. The defendant was a man about 34 years of age, and had a wife and two children. He was poor, thriftless, and, partially at least, depended on his father for support. Up to about nine months previous to the homicide, the defendant had the entire possession and control of his father's property in Kansas, and resided upon the land. His father resided at Springfield, Missouri; but about nine months prior to the homicide, the deceased left Missouri, came to Kansas, and himself took charge of all his property in Kansas, and his wife returned to their former home in the state of New York. At the time of the homicide, William E. Chambers also resided on the farm, near the residence of the defendant. He was also poor and thriftless, and had a wife and five children, and was at the time of the homicide a mere farm-hand, working for the deceased for $16 per month. Immediately prior to the homicide, according to Chambers's testimony, the deceased was about to place nearly all his property in Reno county, real and personal, in the hands of Chambers, for a term of three to five years. This arrangement would have left the defendant almost helpless. By the homicide, however, this contemplated arrangement was completely frustrated, and the defendant at once became, in law, the owner of a one-fourth interest in all the property of the deceased, and was left in fact in the full and exclusive possession of all the property of the deceased in that county. It will therefore appear that Chambers could not have had any motive for killing the deceased; while the defendant might have had.

On the night of the homicide, the deceased slept on a bed in a little room in a corn crib near the defendant's house; and the defendant and his wife and children slept in one room of the defendant's house, and Henry F. Hickock and wife slept in another room of the defendant's house. The piece of iron water-pipe with which the homicide was committed, which was about two feet and seven and one-half inches long, was

at the time on the premises, either in the defendant's yard, near the corn crib, or in the corn crib. During the day preceding the homicide, and during the night of the homicide, the defendant was restless and nervous, and claimed to be sick. About 12 o'clock that night he got up out of his bed, went to the door and window of his bedroom, and looked out of doors, and said he thought he heard somebody whispering. Soon after 4 o'clock in the morning he again got up, though that was earlier than his usual time for rising, put on his clothes, went out to the corn crib for the purpose of getting cobs, as he states, to kindle a fire; and while there, he states, he heard his father breathing heavily. It was still quite dark, and he states that he put his hand on his father's shoulder and shook him, and thought at the time that his father's face was discolored. He immediately went back to the house and aroused his wife and Mr. Hickock and wife, and told them that his "father was either very sick, or else he had been foully dealt with." They all got up, dressed themselves, went to the corn crib, lighted a lantern, which was found in the crib, and then discovered that the deceased was in a dying condition. He died within twenty minutes after they reached the crib, and within half an hour after the defendant first discovered that he was injured.

The coroner was notified, a coroner's jury was summoned, and an inquest was had on that same day, with the result heretofore stated. The testimony of two physicians who examined the deceased within two or three hours after his death, and the testimony of another physician who examined the deceased within one or two days after his death, show that the deceased in all probability could not have lived over half an hour after the injuries from which he died were inflicted; and there was no evidence in conflict with this testimony of the physicians. Evidently, from the testimony of the physicians, they believed that the deceased would naturally have died from the effect of his wounds, within a much shorter period of time; and if in fact he lived for that period of time it was strange. These wounds were inflicted upon the head

and face of the deceased, by sundry blows from an iron water-pipe, in the hands of some person. By these blows, the bones of the forehead and upper part of the face were crushed and broken into small fragments; and the left side of the skull was also fractured all the way around to the back of the head. It is probable also that the *medulla oblongata* was injured; and it is possible also, from the evidence of one witness, that the neck was broken. Each of these several blows was probably sufficient to knock the deceased senseless, and to cause his death. A considerable amount of blood flowed from the wounds, and two or three ounces of brains were forced out, and the wall of the building near the side of the bed where the deceased lay, was spattered with brains and blood. The deceased was probably killed with scarcely a struggle or a motion on his part, and, possibly, while he was asleep; for even the bed-clothes were hardly disturbed when he was first found. He still remained partially covered when first found after the injuries were inflicted.

These are the principal facts of the case, but there are many circumstances which we have not stated which tend to cast suspicion upon the defendant; and there is scarcely anything in the case that tends to cast suspicion upon any other person. The defendant's conduct on the morning of the homicide, when the homicide was first discovered, and also at the time of the coroner's inquest, was at least very strange. His finding his father's scattered clothing in the manner in which he did find it, and his stories with regard to the strange man at the depot at Hutchinson, and with reference to the two boys who "would just as lief kill a man as not," were certainly not very convincing as to his innocence; and really tended to cast suspicion upon him. Besides, the jury, on the trial of this case, as well as at the coroner's inquest, heard the defendant testify, and observed his conduct and actions while testifying.

Now it could not have been Chambers who committed the homicide in this case, for the reason that no motive is shown which might have induced him to commit the homicide. The evidence, indeed, tended to show that by the homicide he in-

curred great loss, and did not obtain any benefit therefrom. Besides, if any evidence had been introduced tending to inculpate Chambers, the state would in all probability have introduced an abundance of evidence showing beyond all doubt that Chambers could not have committed the offense. He was a witness at the trial, and all the evidence upon the subject, from him and from the other witnesses, tended to show that he was at home that night, with his wife and children, until after the homicide was committed. And it hardly seems possible that the homicide could have been committed by any person who contemplated merely robbery or larceny. If the homicide had been committed in the attempted perpetration of a robbery or larceny, the person committing the same would undoubtedly have been armed and would have committed the homicide by means of a knife or pistol, or some other such deadly weapon, and would not have hunted up this piece of iron water-pipe for the purpose. Besides, a person intending to commit only a robbery or a larceny will not, if he can avoid the same, commit a homicide. His object is merely to commit the robbery or the larceny and escape. But the circumstances of the present case show pretty clearly that the object of the person committing the homicide was to kill the deceased.

As before stated, the deceased was killed in his bed, while the bed-covering was still upon him; and there was no appearance of any struggle, or even that he was awake; and he was struck several blows on the head, any one of which would probably have knocked him senseless, and probably killed him. If the object had been merely to commit a robbery or larceny and escape, there would not have been any necessity for *all* these blows, and probably not for any one of them. Besides, nothing was stolen or taken from the premises. Even the twenty dollars in money, which Chambers knew the deceased possessed, and which he knew were in a pocket-book in a chest in the room where the deceased slept, remained undisturbed. All this evidence tends to show that the homicide was not committed by Chambers, or by any person who contemplated merely a robbery or larceny. It is true

the deceased's wearing apparel was scattered in the yard, but it was so scattered, and so found by the defendant, as not to operate against the theory of the defendant's guilt. Indeed, the prosecution claims that it tends to prove the defendant's guilt. Nor is it probable that the offense was committed by some enemy of the deceased who did not reside on the premises; for if the offense had been committed by such a person, he would probably have come armed for that purpose, and would not have hunted up a piece of iron water-pipe to accomplish his object. Besides, it does not appear that the deceased had any enemies, nor does it appear that any person knew or suspected that he had any considerable amount of money; and it would seem from the evidence that he did not in fact have more than twenty dollars in money at the time of his death. Hence, there is but little room to suspect that any person, except the defendant, killed the deceased; and if the opinions of the physicians are correct, it is nearly impossible to suppose that the homicide was committed by any person except by the defendant; for the physicians appear to think that the deceased could not have lived, after the injuries were inflicted, for a greater period of time than the evidence shows that he did in fact live, after the defendant first had knowledge of his injuries. Indeed, the physicians seem to think it strange that he lived for even twenty minutes or half an hour after he received the injuries.

Now while several irregularities occurred in this case, yet we do not think that anything took place to prevent the defendant from having a fair and impartial trial, and we do not think that anything occurred that could in fact have prejudiced any of his substantial rights.

We think the defendant is guilty of the offense charged against him; and, after having a fair trial, as we think he had, it is right that he should suffer the consequences.

The judgment of the court below will be affirmed.

HORTON, C. J., concurring.